# 22-1836

## United States Court of Appeals
### FOR THE SECOND CIRCUIT

VIRGINIA L. GIUFFRE,

*Plaintiff,*

v.

GHISLAINE MAXWELL,

*Defendant,*

v.

TGP COMMUNICATIONS, LLC d/b/a THE GATEWAY PUNDIT,

*Intervenor-Appellant,*

v.

JOHN DOE,

*Non-Party-Appellee.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR NON-PARTY-APPELLEE

Paul M. Krieger
Andrew N. Stahl
KRIEGER KIM & LEWIN LLP
500 Fifth Avenue, 34th Floor
New York, New York 10110
Tel.: (212) 390-9550
*Attorneys for Non-Party-Appellee*

## **TABLE OF CONTENTS**

INTRODUCTION ...............................................................................................1

JURISDICTIONAL STATEMENT ................................................................3

ISSUES PRESENTED.......................................................................................3

STATEMENT OF THE CASE ........................................................................4

   I.   District Court And Previous Appellate Proceedings ......................................4

     A.   The Media Takes Notice ...........................................................5

     B.   This Court's Decision In *Brown v. Maxwell* ...............................7

     C.   The District Court Develops An Unsealing Protocol On Remand ...........8

   II.  Six Years After Entry Of The Protective Order, Three Years After *Brown v. Maxwell*, And More Than Two Years Into The District Court's Diligent Application Of The Unsealing Protocol, TGP Moves To Intervene....................15

SUMMARY OF THE ARGUMENT .................................................................16

ARGUMENT .....................................................................................................17

   I.   Standard Of Review....................................................................17

     A.   The District Court's Discretion Is Broad .................................17

     B.   TGP's "More Rigorous" Abuse Of Discretion Standard, And Any Arguments Going To The Merits Of Unsealing, Are Irrelevant.....................18

   II.  The District Court Did Not Abuse Its Broad Discretion In Denying TGP's Belated Motion To Intervene.....................................................................19

     A.   TGP's Motion Is Beyond Untimely .......................................21

     B.   Intervention By TGP At This Late Stage Would Cause Undue Prejudice To Existing Parties and Only Delay The Ongoing Unsealing Process............41

     C.   No "Additional Relevant Factors" Support Intervention By TGP .........42

CONCLUSION.................................................................................................44

i

# <u>TABLE OF AUTHORITIES</u>

**Cases**

*AT&T Corp. v. Sprint Corp.*,
407 F.3d 560 (2d Cir. 2005) ……………………………………………….30

*Blum v. Merrill Lynch Pierce Fenner & Smith Inc.*,
712 F.3d 1349 (9th Cir. 2013) …………………………………………..31

*Brown v. Maxwell*,
929 F.3d 41 (2d Cir. 2019) ……………………………………... *passim*

*Butler, Fitzgerald & Potter v. Sequa Corp.*,
250 F.3d 171 (2d Cir. 2001) …………………………………...23, 29, 38, 40

*Catanzano ex rel. Catanzano v. Wing*,
103 F.3d 223 (2d Cir. 1996) ……………………………………20, 29, 42

*Crown Fin. Corp. v. Winthrop Lawrence Corp.*,
531 F.2d 76 (2d Cir. 1976) …………………………………………...32

*D'Amato v. Deutsche Bank*,
236 F.3d 78 (2d Cir. 2001) …………………………………...22, 27, 33

*Doe 1 v. United States*,
2015 WL 11254692 (S.D. Fla. Apr. 7, 2015) ……………………………….4

*E.E.O.C. v. Nat'l Children's Ctr., Inc.*,
146 F.3d 1042 (D.C. Cir. 1998) ………........................................................31

*Farmland Dairies v. Comm'r of N.Y. State Dep't of Agric. & Mkts.*,
847 F.2d 1038 (2d Cir. 1988) …………………………………….32, 37

*Ferguson v. Ruane Cuniff & Goldfarb Inc.*,
2019 WL 1434435, (S.D.N.Y. Mar. 29, 2019) …………………………22

*Floyd v. City of New York*,
770 F.3d 1051 (2d Cir. 2014) …………………………………23, 30, 33, 34

ii

*Giuffre v. Dershowitz*,
    410 F. Supp. 3d 564 (S.D.N.Y. 2019) ………………………………………..24

*Giuffre v. Maxwell*,
    827 F. App'x 144 (2d Cir. 2020) ……………………………………2, 12, 35

*H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc*.,
    797 F.2d 85, 89 (2d Cir. 1986) ……………………………………….*passim*

*Hnot v. Willis Grp. Holdings, Ltd.*,
    234 F. App'x 13 (2d Cir. 2007) …………………………………………29

*In re Bank of N.Y. Derivative Litig*.,
    320 F.3d 291 (2d Cir. 2003) …......................................................18, 20, 22

*In re Bank of N.Y. Derivative Litig.*,
    173 F. Supp. 2d 193 (S.D.N.Y. 2001) ………………………………………..22

*In re Holocaust Victim Assets Litig*.,
    225 F.3d 191 (2d Cir. 2000) …………………………………………...30, 32

*In re N.Y.C. Policing During Summer 2020 Demonstrations*,
    27 F.4th 792 (2d Cir. 2022) …………………………………………………..19

*Innovation Ventures LLC v. Pittsburg Wholesale Grocers Inc*.,
    2019 WL 4805041 (E.D.N.Y. Sept. 30, 2019) ……………………………28

*Kamdem-Ouaffo v. Pepsico, Inc.*,
    314 F.R.D. 130 (S.D.N.Y. 2016) ………………………………………..29

*Lugosch v. Pyramid Co. of Onondaga*,
    435 F.3d 110 (2d Cir. 2006) …………………………………………...3

*MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc*.,
    471 F.3d 377 (2d Cir. 2006) …………………………………………...22, 30

*NAACP v. New York*,
    413 U.S. 345 (1973) …………………………………………………...21, 27

iii

*Oneida Indian Nation of Wis. v. New York*,
    732 F.2d 261 (2d Cir. 1984) …………………………………………...18, 20

*Pansy v. Borough of Stroudsburg*,
    23 F.3d 772 (3d Cir. 1994) …………………………………………...31

*Peterson v. Islamic Republic of Iran*,
    690 F. App'x 744 (2d Cir. 2017) …...................................................29–30

*Penn-Star Ins. Co. v. McElhatton*,
    818 F. App'x 67 (2d Cir. 2020) ……...............................................30, 34, 40

*R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*,
    467 F.3d 238 (2d Cir. 2006) ………………………………………….20

*SEC v. TheStreet.Com*,
    273 F.3d 222 (2d Cir. 2001) …………………………………………35

*United States v. Amodeo*,
    44 F.3d 141 (2d Cir. 1995) …………………………………………….7

*United States v. Bank of Am.*,
    303 F.R.D. 114 (D.D.C. 2014) …………………….........................................28

*United States v. City of New York*,
    198 F.3d 360 (2d Cir. 1999) …………………….........................................18

*United States v. New York*,
    820 F.2d 554 (2d Cir.1987) …………………………………………29, 41

*United States v. Pitney Bowes, Inc.*,
    25 F.3d 66 (2d Cir. 1994) …………………………………………….*passim*

*United States v. Yonkers Bd. of Educ.*,
    801 F.2d 593 (2d Cir. 1986) …………………………………………….*passim*

*Verizon N.Y. Inc. v. Jewish People for Betterment of Westhampton Beach*,
    556 F. App'x 50 (2d Cir. 2014) ……………………….....................................39

iv

*Zervos v. Verizon N.Y., Inc.*,
    252 F.3d 163 (2d Cir. 2001) …………………………………………….17

**Statutes and Rules**

28 U.S.C. § 1332(a) ……………………………………………………..3

Fed. R. Civ. P. 24 ………………………………………………………*passim*

## **INTRODUCTION**

This appeal concerns TGP Communications d/b/a the Gateway Pundit's ("TGP's") motion to intervene — in a *seven-year-old case*, to dispute the sealing of court filings made pursuant to a *six-year-old protective order*, which was challenged by TGP's current counsel in this Court more than *three years ago*, *see Brown v. Maxwell*, 929 F.3d 41 (2d Cir. 2019), after which the district court devoted months to developing an unsealing protocol ("Unsealing Protocol"), with input from another intervenor news organization, that it has been implementing for over *two years* — so that TGP can re-litigate the merits of unsealing documents that, as TGP itself admits, may not even exist.

The original underlying action was a defamation suit by Virginia Giuffre against Ghislaine Maxwell, who denied Giuffre's allegations of sexual abuse perpetrated "not only . . . by [Jeffrey] Epstein [and Maxwell], but also . . . by several other prominent individuals." *Brown*, 929 F.3d at 45. Giuffre's allegations garnered significant media attention, including from TGP, an organization that, by its own account, has been "following and reporting on the issues in this case, and have [sic] contributed to providing the public with information regarding this case" since well before it sought intervention. AA-271.

1

Wholly absent from TGP's retelling of this matter, however, are critical facts demonstrating that the district court acted well within its discretion in denying TGP's belated motion.  For example, TGP fails to acknowledge that:

- TGP has had actual or constructive notice of its interest in this case, and specifically the relevant protective and sealing orders, *for at least six years*.

- TGP's current counsel similarly has been aware of this case for *at least six years*, as the same counsel intervened in the action *on January 19, 2017*, on behalf of "an independent blogger and self-described 'popular political journalist'" who sought "to unseal the summary judgment record." *Brown*, 929 F.3d at 46.[1]

- TGP has no actual basis in fact to believe that the so-called "Epstein Client List" it demands be unsealed actually appears in court records constituting "judicial documents" in this case.[2]

TGP's motion is years too late.  Its intervention would disrupt and further delay a carefully-negotiated and crafted unsealing process, the application of which this Court has approved once already, *see Giuffre v. Maxwell*, 827 F. App'x 144, 145 (2d Cir. 2020), and which, by TGP's own count, has resulted in the unsealing of more than 300 judicial documents to date.  TGP Br. at 19–21.  TGP's ability to report on Epstein has in no way been hampered by its status as a non-party and its interests are more than adequately represented, including by other media outlet intervenors.

---

[1]     *See* SA-023; SA-025 (appearances by counsel on behalf of Michael Cernovich).

[2]     *See* AA-271 ("*Though it may be possible that, somehow, no names of the abusers appear in the records that remain sealed*, this is unlikely, and the Court should focus on unsealing those documents or portions thereof that remain sealed." (emphasis added)).

The district court simply did not abuse its discretion in denying TGP's motion to intervene.  This Court should affirm its order.

## JURISDICTIONAL STATEMENT

The district court had diversity jurisdiction over the matter pursuant to 28 U.S.C. § 1332(a).  This Court has jurisdiction over the appeal pursuant to the collateral order doctrine.  *Lugosch v. Pyramid Co. of Onondaga*, 435 F.3d 110, 117–119 (2d Cir. 2006).

## ISSUES PRESENTED

Whether the district court abused its broad discretion in denying TGP's motion to intervene, filed six years after entry of the order implicating its interests, where: (1) TGP and its counsel have been on notice of TGP's interest in the case for at least six years; (2) the district court has spent three years implementing an Unsealing Protocol carefully constructed to meet the requirements set forth in *Brown v. Maxwell*; (3) TGP intends to assert the same arguments already presented by, among others, existing media intervenors; so that (4) TGP can advocate for the unsealing of an alleged "Epstein Client List" that it only presumes to have been filed under seal in this litigation?

3

## STATEMENT OF THE CASE

### I.    District Court And Previous Appellate Proceedings.

In her September 21, 2015 Complaint, Giuffre repeatedly alleged that Maxwell defamed her for the purpose of protecting other "powerful persons" who, according to Giuffre, were involved in sex trafficking of minors. But as this Court recounted in *Brown,* "[t]he origins of this case" go back even further than that and "lie in a *decade*-old criminal proceeding against financier Jeffrey Epstein," beginning with his guilty plea to state charges for soliciting underage prostitution in Florida on June 30, 2008. 929 F.3d at 45 (emphasis added).

"Shortly after Epstein entered his plea," two of his victims anonymously filed suit against the Government in the Southern District of Florida under the Crime Victims' Rights Act ("CVRA"), seeking to nullify the plea agreement on account of "the Government's fail[ure] to inform and consult with them in the process leading up to Epstein's plea deal." *Id.* Giuffre petitioned to join the CVRA action in 2014. She included in her petition "not only descriptions of sexual abuse by Epstein [and Maxwell], but also new allegations of sexual abuse by several other prominent individuals, 'including numerous prominent American politicians, powerful business executives, foreign presidents, a well-known Prime Minister, and other world leaders.'" *Id.* (quoting *Doe 1 v. United States*, 2015 WL 11254692, at *1 (S.D. Fla. Apr. 7, 2015)).

4

## A. The Media Takes Notice.

Although the Florida district court *sua sponte* struck the allegations against certain parties from the pleadings, the "stricken allegations . . . quickly found their way into the press, and several media outlets published articles repeating Giuffre's accusations." *Brown*, 929 F.3d at 45. Indeed, the publicity surrounding Giuffre's accusations against other "powerful persons" was what prompted Maxwell to make the denials that Giuffre characterized in her complaint as defamatory. *See id.* at 45-46.

To alleviate privacy concerns in Giuffre's defamation action, the district court entered a protective order on March 18, 2016 (the "Protective Order"), and a subsequent August 9, 2016 "Sealing Order" that "disposed of the requirement that the parties file individual letter briefs to request sealing and prospectively granted all of the parties' future sealing requests." *Id.* at 46; *see also* AA-097–104. Only *two days* after entry of the Sealing Order, Alan Dershowitz moved to intervene, "seeking to unseal three documents that, he argues, demonstrate that Giuffre invented the accusations against him." *Brown*, 929 F.3d at 46.

On January 6, 2017, Maxwell moved for summary judgment and, ultimately, the "entire summary judgment record," including the parties' "memoranda of law and supporting exhibits contesting this motion" were filed under seal. *Id.* The trial

5

court denied the motion in a "heavily redacted 76-page opinion" on March 22, 2017, with the unredacted version also filed under seal.  *Id.*

On January 19, 2017, two weeks after Maxwell moved for summary judgment, another media client of TGP's counsel, Michael Cernovich, the "independent blogger and [supposedly] 'popular political journalist'. . . moved to intervene seeking to unseal the summary judgment record, and Dershowitz joined his motion." *Id.* at 46 (quoting Br. for Appellant Cernovich at 4).

Shortly thereafter, on May 4, 2017, interested third party media entities NYP Holdings, Inc. (publisher of the New York Post) and Daily News, L.P. (publisher of the New York Daily News) submitted a letter to the court urging Judge Sweet not to allow the parties to "try some or all of this case behind closed doors."  SA-018. Observing that the parties' joint pretrial statement was completely redacted, the letter expressed concern that the parties' "view of the appropriate scope of confidentiality in this case far exceeds what could be considered narrowly tailored to serve a compelling interest," given the presumptive right of access to judicial proceedings. SA-020–21.  Cernovich echoed these sentiments in a letter to the court that TGP's now-counsel submitted that same day.  SA-022.

After the case settled (on May 24, 2017), yet another media outlet, the Miami Herald and reporter Julie Brown (collectively, "the Herald"), moved to intervene on April 6, 2018, to "unseal the entire docket."  *Brown*, 929 F.3d at 46.  The district

court granted all motions to intervene, but denied the intervenors' requests to unseal. *Id.* Dershowitz, the Herald, and Cernovich appealed.

### B. This Court's Decision In *Brown v. Maxwell*.

On July 3, 2019, this Court reversed the district court's order, holding that the district court erred in sealing the summary judgment materials. Because of their dispositive nature, this Court explained, "it is well-settled that documents submitted to a court for its consideration in a summary judgment motion are — as a matter of law — judicial documents to which a strong presumption of access attaches, under both the common law and the First Amendment." *Brown*, 929 F.3d at 47 (citation omitted). Finding "no countervailing privacy interest sufficient to justify their continued sealing," this Court ordered "that the summary judgment documents (with minimal redactions) be unsealed upon issuance of [its] mandate." *Id.* at 48.

As for the remaining sealed items, this Court reiterated that not every paper filed with a trial court is "a judicial document subject to the right of public access." *Id*. at 49 (quoting *United States v. Amodeo*, 44 F.3d 141, 145 (2d Cir. 1995)). Only documents "relevant to the performance of the judicial function and useful in the judicial process" qualify as judicial documents. *Id.* (quoting *Amodeo*, 44 F.3d at 145). Where "documents filed by a party are *not* relevant to the performance of a judicial function, no presumption of public access attaches." *Id*. (emphasis in original).

7

Nor is every "judicial document" subject to the same presumption of public access. The presumption for non-dispositive filings, like those "submitted in connection with discovery disputes or motions in limine" is "somewhat lower" than that applied "to material introduced at trial, or in connection with dispositive motions." *Id*. at 50. Weighed against this "lower" presumption are the interests of those resisting disclosure, including "the potential damage to privacy and reputation that may accompany public disclosure of hard-fought, sensitive litigation." *Id*. at 44. In the case of discovery and evidentiary motions, the reasons articulated for keeping this material sealed "need not be as compelling as those required to seal summary judgment filings." *Id.* at 50.

Having set forth the proper standard for unsealing, this Court remanded the matter to the district court to conduct a particularized review of the remaining sealed documents, consistent with its decision. *Id*. at 54.

### C. The District Court Develops An Unsealing Protocol On Remand.

#### 1. TGP's Current Counsel Concedes That "The Epstein Story Has Now Been Reported On By Major Every [sic] Network And Publication In the World," And Praises The Herald's "Pulitzer-Level" [sic] Reporting.

Immediately upon this Court's issuance of its mandate in *Brown*, the district court scheduled a conference for September 4, 2019, "to discuss how to proceed." SA-026. It issued a further order giving the parties an opportunity to "agree on the

8

categories of documents (judicial documents, non-judicial documents, and something in between)" potentially subject to unsealing and invited the proponents and opponents of unsealing to submit briefing on the matter. SA-029; *see also* SA-030–40 (briefing on the matter). Another round of briefing, another hearing, and several more orders followed.[3] On March 31, 2020, the district court issued a finalized version of its Unsealing Protocol, AA-138, whereby, as set forth in *Brown*, it would consider each of the sealed "documents individually," conduct "particularized review," and render "specific, on-the-record findings" where it determined that continued "sealing is necessary to preserve higher values." 929 F.3d at 48, 51.

The only party who declined to participate in either the development of the Unsealing Protocol or its subsequent application was Cernovich. On September 3, 2019, TGP's now-counsel submitted a letter to the court indicating Cernovich did not believe it was necessary for him to participate in the court's September 4, 2019

---

[3]     On October 28, 2019, the district court entered an order directing counsel to "confer and inform the Court by letter no later than November 12 of the motions that were decided in this case (by docket number) together with the docket numbers of the motion papers associated with each such motion, as further set forth in this Order" for purposes of determining what to unseal. SA-141; briefing at SA-143–80. On December 16, 2019, the court invited counsel to appear for a conference "to discuss the next steps that will enable the Court to conduct an individualized review of the relevant documents and to evaluate properly any countervailing factors that function to limit the weight of the presumption of public access," and "also address notification of third parties named in the documents." SA-181. On January 13, 2020, the district court issued an opinion and order holding that motions not decided by Judge Sweet are not judicial documents subject to the presumption of public access. AA-123. The Herald moved for reconsideration of that decision, SA-183, which the district court denied. AA-134. On March 19, 2020, the district court issued a draft version of its protocol along with an order that resolved other pending disputes. SA-184.

conference, since "Mr. Cernovich was the only party to obtain the exact relief he sought, namely the unsealing of the summary judgment records." SA-027. Cernovich also remarked that, by late 2019, the case had already attracted world-wide media attention. "As the Epstein story has now been reported by major every [sic] network and publication in the world, Mr. Cernovich's work as a reporter has had the desired effect of informing the public and reporting on the most powerful and evil people." SA-028. To top it off, the "Pulitizer-level [sic] work done by Intervenor Julie Brown and her colleagues ha[d] far exceeded any expectation he had regarding the coverage the Jeffrey Epstein case would receive."[4] SA-028.

### 2. The District Court's Unsealing Protocol Accounts For All Competing Interests, Including The Media's, And This Court Approves Its Application In *Giuffre v. Maxwell*.

The district court developed an Unsealing Protocol that speaks to all relevant interests in the unsealing equation. Specifically, the Unsealing Protocol provides for:

- A list of court-approved "Non-Parties" (persons who may have produced discovery in the case, whose privacy interests are implicated by unsealing, or who may have been victimized) to participate in the unsealing process anonymously under pseudonyms such as "Doe #1, Doe #2, Doe #3." AA-138–39.

---

[4] Cernovich closed the letter by noting that he would "notify[] this Court shortly whether he believes his [further] involvement in this case is necessary." SA-028. Insofar as Cernovich ever submitted that notification, it is not reflected on the face of the district court's docket.

- A procedure for the court to conduct its individualized review of multiple sealed documents at once "on a rolling basis and in a manageable fashion." "For example, for Doe #1, the Court would review each Sealed Item that mentions Doe #1, and would do the same for Does #2, #3, etc." AA-139.

- A method for notifying the Non-Parties of the unsealing; allowing them to request excerpts of the documents; allowing them to submit objections to unsealing; allowing Giuffre and Maxwell to file responses to those objections, submit their own objections to unsealing, and, if necessary, for the Court to conduct an evidentiary hearing on the matter. AA-139–42.

- A finding that an order "unsealing a Sealed Item, in whole or in part, as to a Non-Party should be deemed to have affected the Non-Party's rights and interests for purposes of an appeal." AA-140.

In applying the Unsealing Protocol, the district court also allowed already-intervening media actors like the Herald to voice their objections to non-party objections to unsealing.[5] What is more, it considered the interests of outside "[m]embers of the media and the general public" by, for example, publishing a list of the docketed sealed entries that would be subject to unsealing ahead of time, and publicly docketing the call-in number for the telephonic unsealing conferences for anyone who wished to listen.[6]

---

[5]     *See* SA-217 (granting the Herald's request to respond to non-party objections to unsealing); SA-219 & AA-234 (the Herald's responses to non-party objections to unsealing).

[6]     *See* SA-204 ("The Court will rule telephonically on the unsealing of docket materials relevant to docket entries 143, 164, 172, 199, and 230, with respect to Does 1 and 2, on July 23, 2020, at 11:30 a.m. EST. . . .  Members of the media and the general public may join the teleconference using the following listen-only line . . . ."); SA-224 (same).

11

When Maxwell appealed the district court's order unsealing her deposition transcript, this Court held that "*[t]he District Court's order articulated and applied the correct legal framework in its individualized review of the materials to be unsealed*." 827 F. App'x at 145 (emphasis added).

### 3. Mindful Of Efficiency, The District Court Repeatedly Solicits Input From The Parties And The Media In "Streamlining" The Unsealing Protocol.

From the very beginning, the district court prioritized not only thoroughness in unsealing, but also pragmatism. Only a week after finalizing the Unsealing Protocol, for instance, the court took additional briefing from Giuffre and Maxwell and issued an order explaining that it would proceed with unsealing in chronological order to "minimize disputes" and "streamline the unsealing process in the long run." SA-200. A month later, it clarified the Unsealing Protocol, emphasizing that unsealing "is a 'cooperative effort between the Court and the parties,'" and "[s]hould the current process prove unworkable or inefficient, the Court is happy to revisit the review protocol with the parties' input." SA-202–03.

After requesting, SA-205, and receiving still more party briefing concerning "(1) the next step in the Court's individualized review of the sealed materials and (2) suggestions for updating the . . . Protocol . . . to streamline the unsealing process," *see* SA-213 (referring to the parties' submissions at SA-206–12), the court entered an order on August 27, 2020, further modifying the Unsealing Protocol by reducing

12

the time period during which the parties could submit their responses in opposition to the non-party objections from fourteen to seven days.  *Compare* AA-140, *with* AA-162.

The Herald too submitted filings on how to "streamline the process."[7]  In fact, the district court adopted the approach recommended by Giuffre and seconded by the Herald.  AA-229–30.

> **4. The Herald Actively Participates In The Unsealing Briefing And Asserts The Same Argument Advanced By TGP Here: While Abuse Victims Have Valid Countervailing Privacy Interests, Those Accused Of Wrongdoing — Even If Never Criminally Charged Or Convicted — Do Not.**

As the district court moved through each round of Jane and John Does in the unsealing process, the Herald was permitted to, and did, speak on behalf of the public interest in unsealing.  *See* AA-234–35 (the Herald's response to non-party Does 12, 28, 97, 107, 147, 171, and 183's objections to unsealing); AA-232–33 (setting a briefing schedule for the Herald to respond to objections by non-party Does 17, 53,

---

[7]     *See* SA-215 ("Intervenors ask that the Court adopt the proposal submitted by Ms. Giuffre. . . . Reviewing all of the documents referencing objecting Does at once will significantly reduce the number of times a single document is reviewed, redacted (if warranted), and released. This will streamline the process and allow for more timely and meaningful access to these records.").

54, 55, 56, 73, 93, and 151).  The district court explicitly noted its consideration of the Herald's briefing during teleconference hearings.[8]

Most importantly, in advocating for public disclosure, *the Herald made the same argument that TGP insists the district court wrongly prevented it from making here*: that "Redactions Should Be Limited to . . . Information Identifying Sexual Abuse Victims Only," and, "The Remaining Does Do Not Have Countervailing Interests Sufficient to Overcome the Presumption of Access."  AA-236–37. Notably, in its latest filing to the district court (relating to the documents ordered released during the court's November 18, 2022 hearing), the Herald argued that "[i]t is vitally important for the public to understand how the sex trafficking of young girls by the wealthy and powerful was able to persist for years with impunity."  AA-238.  Like TGP, it insisted "[t]he public interest in fully understanding the magnitude of the allegations *and the people involved* far outweighs any Doe's distaste of being associated with Mr. Epstein or Ms. Maxwell."  AA-238 (emphasis added).

---

[8]  *See* AA-175 ("With this presumption of public access in mind, the Court turns to the countervailing interests at stake. The Court has considered the arguments advanced by the parties in their briefing.  It has also considered the submission from intervenors Julie Brown and the Miami Herald Media Company."); AA-243 (referring to the Herald's response to the non-party Does' objections and the non-party Does' replies thereto in weighing countervailing privacy interests).

14

## II. Six Years After Entry Of The Protective Order, Three Years After *Brown v. Maxwell*, And More Than Two Years Into The District Court's Diligent Application Of The Unsealing Protocol, TGP Moves To Intervene.

By the end of July of 2022, the district court had made "significant headway" in the unsealing process. AA-285. It had unsealed 314 documents,[9] and was weeks away from completing its particularized review of the documents naming the non-party Doe objectors (a process that would be resolved at the November 18, 2022 hearing). TGP, however, believing that the court had "fail[ed] . . . to act with any expedition or diligence," decided "three years" after this Court's decision in *Brown v. Maxwell* was just the right time for it to intervene. *See* TGP's Pre-Argument Statement (Form C), Addendum A, ECF No. 12-2 at 2.

TGP filed its motion on July 28, 2022. AA-260; AA-263–78. The district court permitted briefing on the issue, AA-280, and John Doe filed a letter in opposition on August 8, 2022. AA-281. Doe noted the self-evident drawbacks in granting so untimely a motion:

> This Court has implemented a carefully calibrated unsealing protocol that advances Your Honor's individualized review of each sealed docket entry. That protocol, which was first put in place more than two years ago, balances the presumption of public access to judicial documents against the privacy, reputational, and other countervailing interests that support the continued sealing of certain . . . materials in this case. TGP's motion seeks to discard this protocol and thwart its carefully calibrated process and objectives. And the motion offers no

---

[9] This total is based on the TGP's count of unsealed documents in its brief. TGP Br. at 19–21.

reason to do that . . . it merely rehashes certain arguments, conjecture, and hyperbole that have been previously asserted in various efforts to unseal the docket in this case, and that the Court has fully considered and rejected.

AA-281 (record citations omitted).

The district court agreed. On August 9, 2022, it issued an order denying the motion. AA-282–85. It did "not consider TGP's motion to be 'timely,'" and found that TGP's interest in reporting on the Epstein Client List "is already more than adequately represented by existing intervenors" like the Herald. AA-284–85. Because "TGP's intervention at this late stage would only delay, rather than expedite, the Court's review of materials for unsealing," it denied the motion. AA-285. TGP appealed. AA-286.

## SUMMARY OF THE ARGUMENT

The district court did not abuse its broad discretion in denying TGP's eleventh hour request to intervene in order to re-assert the same arguments existing media intervenors have already made.

TGP's motion is *years too late*. Publicity surrounding the case, public filings, and its own counsel's participation in the action should have put TGP on notice of its interest in this action long ago. Delayed intervention at this point would only disrupt the continued progress of a carefully crafted Unsealing Protocol that the parties and the district court have followed for three years, the application of which this Court has approved once already on appeal. Other media intervenors already

16

adequately represent TGP's interests in this matter, and TGP suffers no prejudice by losing the chance to re-state the same arguments.

## **ARGUMENT**

### **I.    Standard Of Review**

#### **A. The District Court's Discretion Is Broad.**

The district court's discretion under Rule 24(b) is "very broad."[10] *H.L. Hayden Co. of N.Y. v. Siemens Med. Sys., Inc*., 797 F.2d 85, 89 (2d Cir. 1986). "When a district court is vested with discretion as to a certain matter, it is not required by law to make a *particular* decision. Rather, the district court is empowered to make a decision — of its choosing — that falls within a range of permissible decisions." *Zervos v. Verizon N.Y., Inc*., 252 F.3d 163, 168-69 (2d Cir. 2001) (emphasis in original).

Though, on appeal, TGP refers to intervention under Rules 24(a) and 24(b) of the Federal Rules of Civil Procedure, it sought only permissive intervention under

---

[10]    *H.L. Hayden Co.* and many other relevant cases refer to permissive intervention under Rule 24(b)(2).  The 2007 amendments to the Federal Rules modified the structure of Rule 24, shifting the subsection governing permissive intervention by an entity seeking to assert a claim or defense sharing a common question of law or fact from Rule 24(b)(2) to Rule 24(b)(1)(B). *Compare* Fed. R. Civ. P. 24(b)(2) (2006) ("Upon timely application anyone may be permitted to intervene in an action: . . . when an applicant's claim or defense and the main action have a question of law or fact in common."), *with* Fed. R. Civ. P. 24(b)(1)(B) (2007) ("On timely motion, the court may permit anyone to intervene who: . . . has a claim or defense that shares with the main action a common question of law or fact.").  The substance of the rule did not change with this restyling, and the current version of Rule 24(b)(1)(B) remains the same as the 2007 amended version.  Thus, for consistency and ease of reference, this brief consistently cites to the standard for permissive intervention under Rule 24(b).

17

Rule 24(b) before the district court.[11]  This Court has previously characterized its review of a district court's denial of permissive intervention as "particularly deferential."  *United States v. City of New York,* 198 F.3d 360, 367 (2d Cir.1999). "Because permissive intervention is (by definition) never mandatory . . . 'reversal of a district court's denial of permissive intervention is a very ra[r]e bird indeed.'"  *In re Bank of N.Y. Derivative Litig.*, 320 F.3d 291, 300 n.5 (2d Cir. 2003) (quoting *United States v. Pitney Bowes, Inc.,* 25 F.3d 66, 73 (2d Cir.1994)).  "In fact, a denial of permissive intervention has virtually never been reversed."  *H.L. Hayden Co*., 797 F.2d at 89 (internal quotation marks omitted).  And this case is no exception.

## B. TGP's "More Rigorous" Abuse Of Discretion Standard, And Any Arguments Going To The Merits Of Unsealing, Are Irrelevant.

To the extent that TGP argues that its appeal should be viewed through a "'more rigorous' abuse of discretion prism," it is mistaken.  TGP Br. at 10.  "The standard of review for . . . unsealing" — whatever TGP believes it to be — is not at issue here.  *Id.*

"[A]n application to intervene cannot be resolved by reference to the ultimate merits of the claims which the intervenor wishes to assert following intervention." *Oneida Indian Nation of Wis. v. New York*, 732 F.2d 261, 265 (2d Cir. 1984).  Indeed, this Court has made clear that consideration of the merits at the intervention stage

---

[11]     *Compare* TGP Br. at 9–11, *with* AA-260.

wrongly "put[s] the cart before the horse." *In re N.Y.C. Policing During Summer 2020 Demonstrations*, 27 F.4th 792, 801 (2d Cir. 2022).

The district court, correctly, denied TGP's motion to intervene. That is the only issue the district court ruled on below, and the only ruling for which TGP can seek review from this Court. John Doe therefore does not address TGP's arguments on the merits of unsealing, and neither should the Court.

## II. The District Court Did Not Abuse Its Broad Discretion In Denying TGP's Belated Motion To Intervene.

Rule 24(b) governs permissive intervention and provides that "[o]n timely motion, the court may permit anyone to intervene who . . . has a claim or defense that shares with the main action a common question of law or fact." Thus, under the plain text of the Rule, timeliness is a "threshold consideration." *Pitney Bowes*, 25 F.3d at 74. Furthermore, the Rule specifically directs that the district court, "[i]n exercising its discretion, . . . must consider whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). In addition, this Court has previously identified "[a]dditional relevant factors [which] include the nature and extent of the intervenors' interests, the degree to which those interests are adequately represented by other parties, and whether parties seeking intervention will significantly contribute to full development of the underlying factual issues in the suit and to the just and equitable adjudication of the

legal questions presented." *H.L. Hayden Co.*, 797 F.2d at 89 (internal quotation marks omitted).[12]

The district court correctly exercised its discretion in denying TGP's motion to intervene, finding that TGP's motion was not timely, that TGP's intervention at this stage would unduly delay the adjudication of the rights of the original parties with respect to the protective order, and that TGP's interests were already adequately represented by existing intervenors. AA-284–85. For the reasons stated below, this Court should affirm the district court's ruling, as TGP does not satisfy any of the considerations for permissive intervention, each of which, alone, is a sufficient basis for the district court's denial of TGP's motion to intervene. *See In re Bank of N.Y.*, 320 F.3d at 300 ("Failure to satisfy *any one* of these requirements is a sufficient ground to deny the application." (emphasis in original) (quoting *Catanzano ex rel. Catanzano v. Wing*, 103 F.3d 223, 232 (2d Cir. 1996))).

---

[12] More recently, in several opinions addressing both intervention of right under Rule 24(a) and permissive intervention under Rule 24(b), this Court has suggested that the analysis for permissive intervention under Rule 24(b) is "substantially the same" as the four-factor test for intervention of right under Rule 24(a). *In re Bank of N.Y.*, 320 F.3d at 300 n.5; *see also R Best Produce, Inc. v. Shulman-Rabin Mktg. Corp.*, 467 F.3d 238, 240 (2d Cir. 2006) (same). The test for intervention of right under Rule 24(a) is "[1] whether the applicant has demonstrated that its application is timely, [2] that it has an interest in the subject of the action, [3] that disposition of the action might as a practical matter impair its interest, and [4] that representation by existing parties would not adequately protect that interest." *Oneida Indian Nation*, 732 F.2d at 265.

As a practical matter, and as this Court has observed, this four-factor test largely overlaps with the factors to be considered for permissive intervention. Because intervention under Rule 24(a) is not at issue here, this brief first addresses the textual requirements of Rule 24(b) — timeliness and undue prejudice to existing parties — and then addresses the "additional" factors outlined in *H.L. Hayden Co.*

## A. TGP's Motion Is Beyond Untimely.

In determining whether a motion is timely, courts consider "(1) how long the applicant had notice of the interest before it made the motion to intervene; (2) prejudice to existing parties resulting from any delay; (3) prejudice to the applicant if the motion is denied; and (4) any unusual circumstances militating for or against a finding of timeliness." *Pitney Bowes*, 25 F.3d at 70. Similar to the decision to grant or deny intervention on the whole, timeliness is "determined by the court in the exercise of its sound discretion; unless that discretion is abused, the court's ruling will not be disturbed on review." *NAACP v. New York*, 413 U.S. 345, 366 (1973).

### 1. TGP Has Had Notice Of Its Interest In This Action For At Least Six Years.

TGP had notice that its interests were implicated in this action at least from the moment the district court entered its Protective Order.

#### a. Case Publicity and Public Filings Put TGP On Notice That Its Interest Was At Stake From The Entry Of the Court's March 18, 2016 Protective Order.

To start, it is well-settled that a case's publication in the press or media contributes toward a proposed intervenor's actual or constructive knowledge that their interest is at issue. *See United States v. Yonkers Bd. of Educ.*, 801 F.2d 593, 595 (2d Cir. 1986) (putative intervenors "had reason to become aware that [issue on which they sought to intervene] would be considered by the court" because the

litigation "became page one news in the Yonkers local newspaper"); *see also In re Bank of N.Y. Derivative Litig.*, 173 F. Supp. 2d 193, 201 (S.D.N.Y. 2001) (motion to intervene denied as untimely where the "lawsuit has been pending for more than two years, and has garnered no small amount of media attention. Hence, [the applicant] has had notice of this action for some time."), *aff'd*, 320 F.3d at 300–01 (quoting district court).

"Courts have [also] found that initiating a lawsuit where the complaint addresses the proposed intervenor's interests may trigger constructive notice." *Ferguson v. Ruane Cuniff & Goldfarb Inc.*, 2019 WL 1434435, at *3 (S.D.N.Y. Mar. 29, 2019); *see also MasterCard Int'l Inc. v. Visa Int'l Serv. Ass'n, Inc.*, 471 F.3d 377, 390 (2d Cir. 2006) (the complaint and plaintiff's "other filings, including its motion for preliminary injunctive relief" are "publicly available for anyone to access" and put movant on notice of its interest in the litigation); *D'Amato v. Deutsche Bank*, 236 F.3d 78, 84 (2d Cir. 2001) ("Appellant filed his motion to intervene . . . more than a year after the complaint was filed, approximately three months following the district court's order that notice be sent to class members, and three days prior to the Fairness Hearing . . . . Appellant offers no explanation for waiting to file his intervention motion until three days prior to the Fairness Hearing.").

Such constructive notice applies, moreover, regardless of whether the movant disclaims actual knowledge of its interest. *See Butler, Fitzgerald & Potter v. Sequa Corp.*, 250 F.3d 171, 182 (2d Cir. 2001) ("Delay is not measured solely subjectively because, if that were the test, a putative intervenor could always claim it did not know it needed to intervene until the eve of its motion.").

In *Floyd v. City of New York*, for example, this Court rejected the movant police unions' argument that "they did not become aware of their interests" in litigation over New York City's "stop-and-frisk" policy until the trial court judge in that action entered an order finding that the policy was carried out in a discriminatory manner and implementing various police reforms. *Floyd v. City of New York*, 770 F.3d 1051, 1058 (2d Cir. 2014). "Regardless of whether this [argument was] true," both the ongoing media coverage and "years of extensive public filings," including "class certification orders," a "preliminary injunction hearing and order, the . . . summary judgment order, the highly publicized . . . bench trial," and "extensive briefing on remedies . . . should have put the unions on notice of the potential political and judicial dangers that these cases posed to their interests well before" entry of the order on liability and reforms. *Id.* at 1058–59.

Here, the record confirms that TGP knew or should have known that its interest was at issue no later than the moment the trial court entered its March 18, 2016 Protective Order. Giuffre's September 21, 2015 Complaint, alone, put any

23

interested member of the public on notice that her defamation action was related to Giuffre's efforts to "expose sex crimes committed around the world by Maxwell, Epstein and other powerful persons." AA-90–91. Again, the publicity surrounding Giuffre's accusations against other "powerful persons" was the very thing that prompted Maxwell to make the denials that Giuffre characterized in her complaint as defamatory. *See Brown*, 929 F.3d at 45–46 ("In response to the allegations, on January 3, 2015, Maxwell's publicist issued a press statement declaring that Giuffre's allegations 'against Ghislaine Maxwell are untrue' and that her 'claims are obvious lies.'").

And as this Court recognized in *Brown*, media attention to Ms. Giuffre's allegations of sexual abuse "by several . . . prominent individuals" apart from Maxwell and Epstein dates back to late 2014 — *ten months before* Giuffre even filed the September 21, 2015 Complaint accusing Maxwell of defamation. *Brown*, 929 F.3d at 45. Alan Dershowitz, who was among the persons Giuffre had accused of abuse, gave extensive interviews denying Giuffre's claims as early as 2015:

> In 2015, Dershowitz made a number of statements in various media outlets, including The Wall Street Journal, The New York Times, the BBC, CNN, the Today Show, and Reuters. These included saying Giuffre's story was "completely, totally fabricated, made-up," that the allegations were "part of a pattern of made up stories against prominent people and world leaders," and that Giuffre is a "serial perjurer," a "serial liar," and a "serial prostitute."
>
> *Giuffre v. Dershowitz*, 410 F. Supp. 3d 564, 566–67 (S.D.N.Y. 2019) (record citations omitted).

24

By its plain terms, moreover, the March 18, 2016 Protective Order would have informed TGP that some of the parties' submissions could be sealed.[13]  Insofar as the effect of the Protective Order was not clear on its face, entry of the Sealing Order on August 9, 2016, and the filings that followed it — in particular the fact that "the entire summary judgment record, including the unredacted version of the District Court opinion denying summary judgment, remained under seal" — told TGP everything it needed to know about whether intervention might be necessary for a media outlet wanting more detailed information.  *Brown*, 929 F.3d at 46.

That the publicity and public filings sufficed to put TGP on notice is confirmed by the fact that multiple other intervenors, including TGP's own counsel, acting on behalf of Cernovich, sought to litigate the unsealing of court records in this case by moving to intervene in the action years ago:

- <u>August 11, 2016</u>.  Only *two days* after entry of the Sealing Order, Dershowitz moves to intervene for the specific purpose of "unseal[ing] . . . documents" that he believed would disprove Giuffre's claims against him.  *Brown*, 929 F.3d at 46.

- <u>January 19, 2017</u>.  Cernovich moves to intervene after Maxwell was permitted to file her entire motion for summary judgment under seal. *Id.*

- <u>May 4, 2017.</u>  NYP Holdings (publisher of the New York Post) and Daily News, L.P. (publisher of the New York Daily News) submit their

---

[13]    *See* AA-100, ¶ 10 (ordering that "[w]henever a party seeks to file any document or material containing CONFIDENTIAL INFORMATION with the Court in this matter," the party "shall" submit "a Motion to Seal" with that filing).

interested party letter to the district court, noting that "*many of the most salacious allegations [in this case] have already been widely reported in the press, many based on interviews with or court filings from Plaintiff herself,*" — citing news publications from October 9, 2016, and January 3, 2015, in support. SA-020 (emphasis added). Now-counsel for TGP filed a similar letter on Cernovich's behalf that same day. SA-022.

- April 6, 2018. The Herald moved to intervene more than four years ahead of TGP on April 6, 2018. *Brown*, 929 F.3d at 46.

So extensive was the coverage that by 2019, in fact, this Court concluded its decision in *Brown* by "urg[ing] the media to exercise restraint in covering potentially defamatory allegations, and . . . caution[ed] the public to read such accounts with discernment." *Brown*, 929 F.3d at 53. On remand from that decision, TGP's counsel acknowledged that "*the Epstein story has now been reported by major every [sic] network and publication in the world,*" including in "[*t*]*he remarkable, Pulitizer-level [sic] work done by Intervenor Julie Brown and her colleagues*" at the Herald. SA-028 (emphasis added).

Other record evidence establishes TGP's obvious notice of its purported interest in this matter. For example, in a letter filed with the district court, John Doe noted that as of August 26, 2019 (approximately seven weeks after Epstein's July 6, 2019 arrest), media coverage of the matter had increased exponentially:

- More than 17,000 different articles concerning the Epstein matter had been published worldwide (which includes print and online reports, but excludes strictly web sources).

26

- If one were to include online blogs and the like, that number would soar to more than 180,000.

- Over 230,000 mentions of the Epstein matter had been broadcast on television worldwide.

AA-114–15.

In view of the foregoing, as well as TGP's admission that it "*has been following and reporting on the issues in this case, and have [sic] contributed to providing the public with information regarding this case*," AA-271 (emphasis added), it is hardly unreasonable to attribute to TGP the same knowledge that other media organizations were astute enough to act upon years ago. *See D'Amato*, 236 F.3d at 84 ("The district court concluded that appellant, who claimed to have spent a substantial amount of time on Holocaust survivors' litigation, had notice of his interest in the instant action well before he filed his intervention motion and that he failed to establish that his motion was timely. . . . We agree."); *see also NAACP v. New York*, 413 U.S. at 366 (media exposure, coupled with "the size and astuteness of the membership and staff of the organizational appellant" supported finding that motion to intervene was untimely).

### b. TGP's Counsel's Knowledge Of The Case And His Awareness of TGP's Interest In Unsealing Is Properly Imputed To TGP.

As noted, TGP's counsel represented Cernovich, the "political journalist" who intervened in the case six years ago. Cernovich succeeded in challenging the district court's sealing of the summary record, *see Brown*, 949 F.3d at 46–48, but declined

27

to participate in developing the Unsealing Protocol since he had already "obtain[ed] the exact relief he sought"; the summary judgment filings were made public, his "work as a reporter has had the desired effect of informing the public and reporting on the most powerful and evil people," and "major . . . network[s]" around the world were actively reporting on Epstein.  SA-027–28.

Counsel's indisputable awareness of and prior participation in the action for the purpose of unsealing court records further proves that TGP's motion is years too late.  *See United States v. Bank of Am.*, 303 F.R.D. 114, 119 (D.D.C. 2014) (holding intervention twenty months after entry of consent judgment to be untimely where movant had "actual or constructive notice" of consent judgment due to public reporting, and movant's attorney had "actual or constructive knowledge" of consent judgment at the time it was entered "because the Consent Judgment partially settled a lawsuit in which counsel represented a whistleblower").

Denying a motion to intervene "in this now-closed case" after so "substantial" a delay is well within the district court's discretion, "especially given the fact that [TGP's] counsel represented [a] part[y] in this action and w[as] aware of the availability of the protected discovery materials" that TGP now demands that the district court unseal.  *Innovation Ventures LLC v. Pittsburg Wholesale Grocers Inc.*, 2019 WL 4805041, at *3 (E.D.N.Y. Sept. 30, 2019) (denying intervention in closed case by movant seeking to unseal deposition transcripts, due to "substantial" 16-

28

month delay, where movant's counsel "represented parties in this action and were aware of the availability of the protected discovery materials").

### c. Six Years Is Too Long A Delay To Intervene As A Matter Of Law.

Case law governing the timeliness of a long-delayed intervention motion is well settled. "In most instances, a motion to intervene based on a claim that was known, but not acted upon, for a period of years would be untimely." *Kamdem-Ouaffo v. Pepsico, Inc.*, 314 F.R.D. 130, 135 (S.D.N.Y. 2016) (citation omitted) (collecting cases).

This Court has repeatedly affirmed the denial of permissive intervention for motions filed at least one year too late. *See Butler*, 250 F.3d at 182 (*twelve-month* delay found untimely for purposes of intervention); *Catanzano*, 103 F.3d at 232–33 (denying intervention where the motion was filed *at least 18 months* after the applicants should have known of their interest in the litigation); *United States v. New York*, 820 F.2d 554, 557 (2d Cir.1987) (denying motion to intervene where *15 months* elapsed after the applicant knew or should have known of the unrepresented interest); *Pitney Bowes*, 25 F.3d at 71 (denying intervention where movant had constructive knowledge of interest *15 months* prior to motion to intervene and actual knowledge for *eight months*); *Hnot v. Willis Grp. Holdings, Ltd.*, 234 F. App'x 13, 14–15 (2d Cir. 2007) (motion to intervene untimely where movant waited approximately *14 months* to file motion); *Peterson v. Islamic Republic of Iran*, 690

F. App'x 744, 746 (2d Cir. 2017) ("Cook should have known of the need to intervene by October 3, 2011, when he was purportedly fired for cause, but he waited more than *four years* to file his motion — a factor that weighs against finding that his motion was timely." (emphasis added)).  Indeed, even delays of less than one year can render a motion untimely.[14]

TGP, on the other hand, does not identify a single Second Circuit case permitting intervention six years after the movant had actual or constructive notice of its interest in the case — much less one wherein this Court reversed a district court's judgment in order to do so.  TGP Br. at 12.[15]  If anything, the only Second Circuit case TGP points to confirms that the district court's discretion in denying intervention should not be disturbed on appeal.  *See AT&T Corp.*, 407 F.3d at 562 ("Reversal of a district court's denial of permissive intervention is a very rare bird

---

[14]    *See MasterCard*, 471 F.3d at 390–91; *see also In re Holocaust Victim Assets Litig.*, 225 F.3d 191, 198–99 (2d Cir. 2000) (holding that an *eight-month* delay rendered a motion to intervene untimely); *Floyd*, 770 F.3d at 1058–62 (affirming denial of motion to intervene where applicants had constructive knowledge of their interests from public filings and news media reports made *less than nine months* before they moved to intervene); *Penn-Star Ins. Co. v. McElhatton*, 818 F. App'x 67, 71 (2d Cir. 2020) (district court did not abuse its discretion in denying motion to intervene filed approximately *seven months* after movant had notice of its interest in action).

[15]    TGP cites to *AT&T Corp. v. Sprint Corp.*, 407 F.3d 560, 562 (2d Cir. 2005), for the proposition that "permissive intervention is the proper method for a nonparty to seek a modification of a protective order."  No one disputes that such a motion is the proper vehicle for a non-party to request unsealing of court records.  But the fact that the method itself is permissible does not mean that such motion should be granted — and the motion at issue in *AT&T Corp.* was not.  *See id.* at 562 ("Drizin's sole argument seems to be that the district court should have allowed him to intervene in this case because he is entitled to a modification of the Protective Order.  He is wrong.").

30

indeed, so seldom seen as to be considered unique." (quoting *Pitney Bowes*, 25 F.3d at 73)).

None of TGP's out-of-circuit authority favors intervention under the circumstances presented here either. For example, while the Ninth Circuit affirmed the district court's grant of intervention after the underlying case was settled in *Blum v. Merrill Lynch Pierce Fenner & Smith Inc*., 712 F.3d 1349 (9th Cir. 2013), the movant's interest in *Blum* "did not arise until it was sued by [the plaintiff]," and the movant filed its motion only "one day" after its interest arose. *Id***.** at 1354. Permissive intervention was also granted after the original parties settled in *E.E.O.C. v. Nat'l Children's Ctr., Inc*., 146 F.3d 1042 (D.C. Cir. 1998), but the defendant "concede[d] that [the] motion was timely" in that case, and the court saw "no reason to reject this concession." *Id.* at 1047. And in contrast to TGP's six-year delay, the movant in *Pansy v. Borough of Stroudsburg*, 23 F.3d 772 (3d Cir. 1994) waited only "six and one-half months" to intervene for the purpose of unsealing. *Id.* at 778-79.

TGP's motion is untimely and it cites no precedent to the contrary.

### 2. The Prejudice To Existing Parties Resulting From TGP's Six-Year Delay Is Substantial.

"The principal guide in deciding whether to grant permissive intervention is 'whether the intervention will unduly delay or prejudice the adjudication of the rights of the original parties.'" *Pitney Bowes*, 25 F.3d at 73 (quoting Fed. R. Civ. P. 24(b)).

31

       **a. TGP's Late-Filed Post-Judgment Motion For Intervention Disrupts The Orderly Administration of Justice.**

Because Giuffre and Maxwell settled this case *more than five years ago* (on March 24, 2017), TGP's motion is one for "post-judgment" permissive intervention. And "post-judgment intervention . . . is generally disfavored because it usually creates delay and prejudice to existing parties . . . and undermines the orderly administration of justice." *Yonkers Bd. of Educ.*, 801 F.2d at 596; *see also Farmland Dairies v. Comm'r of N.Y. State Dep't of Agric. & Mkts.*, 847 F.2d 1038, 1044 (2d Cir. 1988) ("The harm Appellants face absent leave to intervene — competition from Farmland — does not, in our view, tip the balance in their favor, especially in the context of post-judgment intervention." (footnote omitted)); *Crown Fin. Corp. v. Winthrop Lawrence Corp.*, 531 F.2d 76, 77 (2d Cir. 1976) ("Intervention after judgment is unusual and not often granted.").

       **i. Courts Are Well Within Their Discretion To Deny Post-Judgment Intervention Where The Movant's Participation Interferes With Hard-Fought, Agreed-Upon Remedies.**

This Court has observed "that jeopardizing a settlement agreement causes prejudice to the existing parties to a lawsuit." *Pitney Bowes*, 25 F.3d at 72.[16] In a

---

[16]     *See also In re Holocaust Victim Assets Litig.*, 225 F.3d at 202 ("[Permissive] intervention would prejudice the adjudication of the rights of the existing parties by destroying their

similar vein, it has deferred to a lower court's refusal to permit intervention where doing so would undo "literally years" or even mere "months" of remedial proceedings. *See Yonkers Bd. of Educ.*, 801 F.2d at 595–96; *see also Floyd*, 770 F.3d at 1059–60 (affirming denial of intervention by police unions in litigation over "stop-and-frisk" policy, where unions "moved to intervene after liability and remedies had been adjudged," and "[a]llowing intervention at this late juncture would prejudice plaintiffs and the City by postponing resolution of this now-settled dispute and frustrating both parties' desire to promptly engage in agreed-upon reforms").

In *Yonkers Board of Education*, after finding that the City had improperly segregated schools, the trial court issued a "Remedy Order" requiring Yonkers to execute an agreement with HUD for the building of certain multi-family housing sites. Homeowners living near the "court-specified sites" moved to intervene "so that they c[ould] present new evidence, including expert testimony, bearing on the issues of suitability of various other sites and on the court-specified sites." *Yonkers Bd. of Educ.*, 801 F.2d at 594. Even though they sought intervention *only two weeks*

---

Settlement[.]"); *Pitney Bowes*, 25 F.3d at 72 (holding that "intervention [of right and by permission] would result in prejudice to existing parties because the court would have been unavoidably obliged to delay entry of the consent decree," and "[the parties] would have had to begin negotiations again from scratch," in spite of earlier negotiations that lasted for eight months); *D'Amato*, 236 F.3d at 84 (no abuse of discretion in denying intervention where "especially in light of Georgi's request to add parties to the action, this late intervention would potentially derail the settlement and prejudice the existing parties, who had been engaging in settlement negotiations for several months").

after the Court entered the Remedy Order, the trial court denied their motion as untimely, as site selection had already been the focus of "exhaustive inquiry" and "the taking of further evidence as proffered by the appellants would" only further delay the process. *Id.* This Court affirmed.

Here too, allowing TGP's eleventh-hour intervention "after . . . years of litigation and negotiation" *Penn-Star Ins.*, 818 F. App'x at 71, would only further delay resolution, prejudice both party and non-party participants who have come to rely on the Unsealing Protocol, "and undermine[] the orderly administration of justice." *Floyd*, 770 F.3d at 1059–60 (quoting *Yonkers Bd. of Educ.*, 801 F.2d at 596).

> ii. **The Court, The Parties, And Other Media Interests Have Devoted Significant Time And Resources To Developing And Implementing The Unsealing Protocol Over The Past Three Years.**

TGP's primary demand is that the "Epstein Client List" — *i.e.*, documents that TGP believes will name the names of persons allegedly involved in sex trafficking — must be released.[17]  It also complains that the district court granted "blanket permission . . . to all [third parties] who happen to have been named" in the

---

[17]    Assuming, of course: (1) that such documents actually exist; (2) that they were actually filed and remain under seal in this litigation and qualify as judicial records subject to public disclosure; and (3) that upon particularized review, no countervailing privacy interests actually outweigh the public interest in disclosure of any hypothetical individual document naming these names.

sealed documents to participate in the Unsealing Protocol "pseudonymously" — as if to imply that non-parties should have to identify themselves in their objections to unsealing, thereby destroying the very privacy rights they seek to protect. TGP Br. at 15–16.

Not only is this procedure wholly consistent with this Court's precedent,[18] it is also the product of *nearly seven months of district court proceedings* (from September 5, 2019 through March 31, 2020). Once the Protocol was settled, the district court, the parties (including intervenor the Herald) and non-party Does spent the next *three years* litigating its application, which, as even TGP admits, involved efforts by the district court to "streamline" the process, making it more efficient.[19] TGP waited so long, in fact, that by the time it intervened, this Court had already approved an application of the district court's Unsealing Protocol two years earlier in *Giuffre v. Maxwell*. *See* 827 F. App'x at 145 ("The District Court's order articulated and applied the correct legal framework in its individualized review of the materials to be unsealed.").

By TGP's count, the district court had unsealed a total of 314 documents as of the time it filed its appellate brief. That total is now up to 348 documents. SA-

---

[18]    *See Brown*, 929 F.3d 41, 50 n.33 (noting "the presumption of public access does *not* apply to material that is submitted to the court solely so that the court may decide whether that same material must be disclosed in the discovery process or shielded by a Protective Order" (emphasis in original) (citing *SEC v. TheStreet.Com*, 273 F.3d 222, 233 (2d Cir. 2001)).

[19]    *See* TGP Br. at 21 (citing AA-229).

225–26 (notices of documents ordered unsealed).  The district court has come so far, in fact, that it has completed its particularized review of all documents relevant to the sixteen non-party Does who objected to unsealing.  SA-226.  As of December 13, 2022, "the Court [has] now turn[ed] to its particularized review of the documents revealing the names of non-parties who have failed to file objections to unsealing."  SA-226; *see also* SA-228 (submitting parties' joint chart identifying the non-objecting Does as the district court requested).

If TGP could intervene now and demand that "any [sealed] document or portion thereof" that "name[s] an alleged client of Jeffrey Epstein . . . should be immediately unsealed,"[20] much of the district court's work would be for naught and long resolved issues would need to be re-litigated.

### b. TGP's Desire To Re-litigate Already Rejected Arguments Does Not Warrant Intervention.

Instead of addressing the foregoing prejudice, TGP suggests that its last-minute intervention "may effect [a] quicker unsealing" process.  TGP Br. at 14.  In reality, however, TGP merely seeks to rehash arguments that could have been or were raised in the district court, and rejected by it, years ago.

TGP claims, for instance, that the district court erred in denying the Herald's motion to reconsider its January 13, 2020, order concluding that "only motions

---

[20]     *See* AA-269.

actually decided by Judge Sweet — along with the documents relevant to Judge Sweet's decisions on those motions — are properly considered judicial documents to which a right of public access attaches."  AA-123; AA-134–37.  TGP believes this ruling is contrary to *Brown*, notwithstanding this Court's instruction that no presumptive right of access attaches to filed documents that "are *not* relevant to the performance of a judicial function."  *Brown*, 929 F.3d at 49 (emphasis in original).  Yet even if TGP were correct, the time to challenge that order was *three years ago* when the district court issued it, not after the parties have been applying the Unsealing Protocol consistent with that order for years.  *See Farmland Diaries*, 847 F.2d at 1044 ("[I]f Appellants were permitted to intervene at this late date, there is no question that the settlement concluded by Farmland and the State would be jeopardized.").

What is more, TGP's argument is the same one that the Herald asserted in moving for reconsideration and that was rejected; namely, that "the January 13 Opinion is 'directly contrary' to the Second Circuit's guidance in *Brown v. Maxwell*."  AA-135.  Allowing intervention just so that TGP can "relitigate" these already-decided questions will do nothing to make the unsealing process move any quicker.  *See Yonkers Bd. of Educ.*, 801 F.2d at 596.

As in *Yonkers Board of Education*, TGP's effort to interject itself into this years-old litigation "resembles" the kind of "post-judgment intervention" that

37

prejudices the existing parties and "undermines the orderly administration of justice." *Yonkers Bd. of Educ.*, 801 F.2d at 596. "In the interest of finality, there must come a time, once all affected parties' opportunities to protect their interests have passed, when the remedy, if otherwise lawful, must be allowed to proceed." *Id.*

That time has come. TGP's appeal should be summarily rejected.

### 3. TGP Suffers No Prejudice By The Denial Of Intervention.

#### a. TGP Fails To Rebut The Presumption That Existing News Media Intervenors Adequately Represent TGP's Interests.

The Second Circuit "demand[s] a more rigorous showing of inadequacy" in cases where the putative intervenor and existing parties "have the same ultimate objective." *Butler*, 250 F.3d at 179. "Where there is an identity of interest, as here, the movant to intervene must rebut the presumption of adequate representation by the party already in the action." *Id.* at 179–80. In this case, with the Herald and other media members already in the action, and "the Epstein story" having been reported on by "major every [sic] network and publication in the world," TGP cannot plausibly rebut that presumption. SA-028.

As explained, the Herald shares TGP's interest in reporting on the case. Like TGP, it has argued that the identities of those allegedly involved in sex trafficking must be disclosed, despite the risks of reputational harm. "[A]ny adults who

38

participated in these acts or can shed light on these facts cannot shield the public's eyes . . . *The public interest in fully understanding the magnitude of the allegations and the people involved far outweighs any Doe's distaste of being associated with Mr. Epstein or Ms. Maxwell*." AA-238 (emphasis added). Thus, the Herald is already litigating the very issue TGP sought to raise.

In addition, Cernovich, the "popular political blogger" has never formally withdrawn from the case, and is seemingly still represented by TGP's own counsel. So likely aligned are TGP's and Cernovich's interests, in fact, that TGP's motion for permissive intervention includes phrases that appear in Cernovich's own motion filed six years earlier.[21]

That Cernovich has not recently "been actively involved" in the district court and that the Herald and Brown "have not yet succeeded in obtaining" the "Epstein Client List" is irrelevant. TGP Br. at 13. These existing intervenors still "make the same arguments and have the same objective" as TGP. *Verizon N.Y. Inc. v. Jewish People for Betterment of Westhampton Beach*, 556 F. App'x 50, 52 (2d Cir. 2014) (denial of intervention affirmed where existing defendants shared "the same

---

[21] *Compare* Cernovich's Motion, SA-001 ("If Cernovich Media is not permitted to intervene and view court records, it will suffer great impairment, *as it cannot perform their Fourth Estate function* without access to public documents." (emphasis added)), *with* TGP's Motion, AA-270 ("TGP *cannot conduct its Fourth Estate function* if this Court allows the worst criminals to hide in the shadows." (emphasis added)); *compare also* SA-001 ("The courts do not belong to the parties — they belong to the people."), *with* AA-270 ("The courts do not belong to Epstein's clients — they belong to the people.").

objective" as the movants).  All TGP has lost is the opportunity "to relitigate issues which have already been decided after lengthy proceedings." *Yonkers Bd. of Educ.*, 801 F.2d at 596.

> **b. Any Prejudice TGP Does Suffer Results From Its Own Failure To Act On Its Interests For Six Years.**

Even if TGP could demonstrate prejudice, "any prejudice to [it] resulting from the denial of intervention may be attributed to [TGP's] own failure to seek intervention when [it] first had reason to become aware that the [issue on which it seeks to intervene] would be considered by the court." *Yonkers Bd. of Educ.*, 801 F.2d at 595.

Unlike the prejudice that the parties will experience if TGP is permitted to disrupt unsealing proceedings, any prejudice to TGP would have been "avoidable," had it merely acted years ago when the trial court's filings put TGP on notice of its interests. *See, e.g.*, *Penn-Star Ins.*, 818 F. App'x at 71 (prejudice to the movant in being denied intervention could be discounted because "unlike the prejudice to Penn-Star and Management," prejudice to the movant "was avoidable").  No abuse of discretion can be found in the district court's determination that the "limited benefit of allowing a second" (or third) media representative to intervene just to restate the same rejected arguments is outweighed by the harm of further delaying proceedings in this seven-year-old litigation.  *See Butler*, 250 F.3d at 182–83

(affirming denial of intervention in a "nearly nine-year-old litigation" where movant's intervention would "provide only the limited benefit of allowing a second party to argue the merits of GBJ's case").

### 4. Any "Unusual Circumstances" Weigh In Favor Of The District Court's Finding That TGP's Motion Was Untimely.

Finally, any "usual circumstances" — to the extent they exist — further support a finding of untimeliness. As described above, despite its awareness of this litigation, and the Unsealing Protocol specifically, TGP waited until years into to the implementation of the Unsealing Protocol before moving to intervene. *Cf. United States v. New York*, 820 F.2d at 557 (holding applicant's years-long awareness of hiring quota he sought to challenge and delay in seeking intervention until he was no longer eligible for position constituted "unusual circumstances" further supporting finding of untimeliness).

### B. Intervention By TGP At This Late Stage Would Cause Undue Prejudice To Existing Parties and Only Delay The Ongoing Unsealing Process.

As previously noted, in addition to timeliness, Rule 24(b) specifically instructs a district court to consider "whether the intervention will unduly delay or prejudice the adjudication of the original parties' rights." Fed. R. Civ. P. 24(b)(3). For the reasons stated in Section II.A.2, *supra*, TGP's intervention would

substantially prejudice the rights of the existing parties and only serve to delay and disrupt the district court's ongoing orderly administration of the Unsealing Protocol.

### C. No "Additional Relevant Factors" Support Intervention By TGP.

TGP's untimeliness in moving to intervene and the prejudice that such an intervention would cause to existing parties are each, on their own, sufficient bases for this Court to affirm the district court's sound exercise of its discretion in denying the motion to intervene. *See Catanzano*, 103 F.3d at 234 (holding untimeliness alone is sufficient grounds for denial of motion for permissive intervention); *Pitney Bowes*, 25 F.3d at 73 (describing delay or prejudice to existing parties as the "principal guide in deciding whether to grant permissive intervention"). Nevertheless, in the interest of completeness, Appellee briefly addresses the "additional relevant factors" listed in *H.L. Hayden Co.* and cited by the district court in its decision. AA-284

### 1. TGP Does Not Have A Direct Interest In This Matter That Would Support Intervention.

As this Court's decision in *H.L. Hayden Co.* makes clear, a non-party seeking permissive intervention solely for purposes of modifying a protective order "has no direct interest in the underlying litigation." 797 F.2d at 89. TGP's position here is indistinguishable from that of the putative intervenor in *H.L. Hayden Co.* It seeks modification of a protective order that protects "not . . . its own confidential documents or work product, but rather . . . those of the original litigants." *Id*. at 88.

42

Thus, TGP's lack of any direct interest in this matter further supports the district court's sounds exercise of its "very broad" discretion to deny intervention. *Id*. at 89.

### 2. Any Interest TGP Has Is Already Adequately Represented By Existing News Media Intervenors.

For the reasons stated in Section II.A.3.a, *supra*, and as the district court correctly observed, any limited interest TGP has in this litigation is sufficiently represented by existing news media intervenors.[22]

### 3. Intervention By TGP At This Late Stage Will Not Contribute To The Development Or Adjudication Of Any Underlying Issues.

Finally, for substantially the same reasons stated in Section II.A.2, TGP's intervention would delay and frustrate the just and equitable adjudication by the district court of the limited remaining decisions regarding unsealing. The underlying litigation in this matter was resolved more than five years ago. The Unsealing Protocol — itself the product of months of litigation and substantial effort by the

---

[22]     In its opening brief, TGP claimed that the district court "improperly invoke[d] Rule 24(a)(2), finding that TGP's interest are [sic] already adequately represented," and erroneously asserted that "[w]hether or not TGP's interests are 'adequately represented' is not a consideration under Rule 24(b) . . . ." TGP Br. at 13. The district court did not err in considering whether TGP's interests were already adequately represented, and TGP's suggestion that it did is plainly incorrect. As an initial matter, as previously noted, this Court has suggested that analysis of intervention under Rule 24(a) and Rule 24(b) is "substantially the same." *See* n.12, *supra*. In addition, in *H.L. Hayden Co.* this Court explicitly listed "the degree to which [a putative intervenor's] interests are adequately represented by other parties" as a factor district courts may consider in their Rule 24(b) analysis. 797 F.2d at 89 (internal quotation marks omitted). Furthermore, for the reasons stated in Section II.A.3.a, *supra*, the adequacy of existing representation of TGP's interests is relevant to the question of whether TGP was prejudiced by the denial of its motion to intervene, which, in turn, is a factor in assessing timeliness.

43

district court, the parties, and the non-party Does — has been carefully implemented by the district court for the past three years.  At this late stage, relying on speculation and hyperbole, TGP brings nothing to the unsealing process but further delay in an improper attempt to relitigate issues already addressed by the district court.

## **<u>CONCLUSION</u>**

For these reasons, this Court should affirm the district court's judgment.

Dated:          February 27, 2023
                New York, New York

                                    Respectfully submitted,


                        By:   <u>/s/ Paul M. Krieger</u>
                              Paul M. Krieger
                              Andrew N. Stahl
                              KRIEGER KIM & LEWIN LLP
                              500 Fifth Avenue, 34th Floor
                              New York, New York 10110
                              Tel.: (212) 390-9550

                              *Attorneys for Non-Party-Appellee*

**CERTIFICATE OF COMPLIANCE**

Pursuant to Federal Rule of Appellate Procedure 32(g), the undersigned counsel hereby certifies that this brief complies with the type-volume limits of Federal Rule of Appellate Procedure 32(a)(7)(B) and Local Rule 32.1(a)(4) because, excluding certain parts of the document exempted by Federal Rule of Appellate Procedure 32(f), this document contains 11,160 words.

This document complies with the typeface and typestyle requirements of Federal Rules of Appellate Procedure 32(a)(5) and 32(a)(6) because this document has been prepared in proportionally spaced typeface using Microsoft Word in 14-point Times New Roman Font.

Dated: February 27, 2023                    /s/ Paul M. Krieger
                                            Paul M. Krieger